**LEWISTON DAILY SUN, INC.**

v.

**CITY OF AUBURN, et al.**

Supreme Judicial Court of Maine.

Argued May 10, 1988.
Decided July 28, 1988.

Bryan M. Dench (orally), Laurie A. Gibson, Skelton, Taintor & Abbott, Auburn, for plaintiff.

Curtis Webber (orally), Linnell, Choate & Webber, Auburn, for defendants.

Before McKUSICK, C.J., and
ROBERTS, WATHEN, GLASSMAN,
SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

On report, the Superior Court (Androscoggin County) asks us to determine whether the meetings of the special Civil Service Study Committee of the City of Auburn constitute "public proceedings" under the Maine Freedom of Access Act, 1 M.R.S.A. §§ 401–410 (1979 & Supp.1987), and are thus subject to the Act's open meetings requirement. *Id.* § 403. The Superior Court ordered the report after having granted a temporary restraining order in favor of plaintiff *Lewiston Daily Sun* (Daily Sun) enjoining the committee from holding further meetings closed to the public. Because the facts of this case show a close link between the committee and Auburn's city council and mayor, and because that committee is vested with important investigatory functions that if not delegated to it would have been exercised directly by the City's governing authorities, we declare that the committee's meetings are "public proceedings" within the meaning of the Act.

Following a number of complaints about alleged improprieties in the operation of the City of Auburn's Civil Service Commis-

sion,[1] as well as the resignation in protest by two members of the commission, the Auburn city council in December 1987 by a vote of 5–0 directed the mayor to appoint a committee to investigate the alleged wrongdoing and to make recommendations on how best to resolve any problems found. The mayor then appointed seven persons having no connections with city government to serve on what he called the Civil Service Study Committee. The committee had no budget and its members were not paid for their efforts. The committee first met on January 5, 1988, and was to present its conclusions to the mayor and city council in 6 to 8 weeks. The mayor attended that first meeting, set forth to the committee its responsibilities, and offered some suggestions on whom the committee might interview. The committee's first meeting was open to the public, but at that meeting its members voted to hold future sessions in private. The committee then proceeded to meet twice a week, interviewing two or three persons at each meeting.

On February 3 the Daily Sun filed a complaint in Superior Court against the committee and the City of Auburn, alleging that the committee's closed meetings violated the Freedom of Access Act and seeking declaratory and injunctive relief under 14 M.R.S.A. §§ 5954, 5960 (1980). That same day the newspaper also moved for a temporary restraining order enjoining any future closed meetings by the committee. The court heard and granted that motion on February 4. After a period of discovery the court, on the City's motion agreed to by the Daily Sun, reported the case to us under M.R.Civ.P. 72(c).

We determine that the meetings of the investigatory committee created and charged by the Auburn city council and mayor are public proceedings subject to the Act's open meetings requirement. The declaration of policy prefacing that Act states

that public proceedings exist to aid in the conduct of the people's business. It is

the intent of the Legislature that their actions be taken openly and that the records of their actions be open to public inspection and their deliberations be conducted openly. It is further the intent of the Legislature that clandestine meetings, conferences or meetings held on private property without proper notice and ample opportunity for attendance by the public not be used to defeat the purposes of this subchapter.

1 M.R.S.A. § 401 (1979). Section 401 concludes by directing that the Freedom of Access Act "shall be liberally construed and applied to promote its underlying purposes and policies as contained in the declaration of legislative intent." *Id. See also Wiggins v. McDevitt,* 473 A.2d 420, 422 (Me.1984). The Act mandates that "all public proceedings shall be open to the public," 1 M.R.S.A. § 403, and defines "public proceedings" comprehensively as

the transactions of any functions affecting any or all citizens of the State by any of the following:

A. The Legislature of Maine and its committees and subcommittees;

B. Any board or commission of any state agency or authority, the Board of Trustees of the University of Maine System and any of its committees and subcommittees, the Board of Trustees of the Maine Maritime Academy and any of its committees and subcommittees, the Board of Trustees of the Maine Vocational–Technical Institute System and any of its committees and subcommittees; and

C. Any board, commission, agency or authority of any county, municipality, school district or any regional or other political or administrative subdivision.

*Id.* § 402(2)(A)–(C) (1979 & Supp.1987).

■ The City points to the absence of any reference to "committees" in the Act's enumeration of the municipal entities whose meetings it covers as an indication of the legislature's intent not to include as public proceedings the meetings of the Au-

---

**1.** By ordinance the City of Auburn has vested the Civil Service Commission with authority to test applicants for civil service positions with the City and to appoint and promote persons to those positions.

burn Civil Service Study Committee. The City observes that whereas the "committees and subcommittees" of the legislature and of the boards of trustees of various state-run educational systems are explicitly included in the coverage of the Act, no similar mention is made of municipal committees and subcommittees. *Compare* 1 M.R.S.A. § 402(A)–(B) *with id.* § 402(C).

We refuse to adopt such a formalistic approach to statutory construction, however, and reject the notion that the statute forces that restricted reading upon us. The Act itself does not define what constitutes a "board, commission, agency or authority," just as it does not define the term "committee." Faced with this ambiguity as to what type of public entities fall within the terms of the Act, we turn to its legislative history and find there no support for the City's position. *See State v. Edward C.*, 531 A.2d 672, 673 (Me.1987); *Mundy v. Simmons*, 424 A.2d 135, 137 (Me.1980). By amendments adopted in 1975 to the Freedom of Access Act, the legislature's committees and subcommittees were specifically included in the definition of public proceedings. *See* P.L. 1975, ch. 758. In 1977 the legislature further amended the Act to include specifically within its scope the "committees and subcommittees" of certain public educational institutions as well. *See* P.L. 1977, ch. 164, § 1. *See also* P.L. 1985, ch. 695, § 2. Those amendments, far from manifesting a legislative intent *not* to include municipal committees within the Act's reach, suggest only that the legislature was faced with specific circumstances peculiar to the legislature and public educational institutions and wanted to leave no doubt that their committees and subcommittees are covered by the Act. From the legislature's amendment of specific subsections of the Act, we can draw no particular meaning about a subsection it has left unchanged. *See Myrick v. James*, 444 A.2d 987, 991 (Me.1982).

Furthermore, the reading advocated by the City elevates form over substance in a manner impermissible when the Act elsewhere requires that we construe its terms liberally to ensure that public proceedings "be conducted openly." 1 M.R.S.A. § 401.

We see no meaningful ground for determining whether an entity is a "committee" and hence according to the City's contention outside the reach of the Act, or a "board, commission, agency or authority." Considered in isolation, such appellations when attached to a particular public entity reflect little more than the arbitrary decision of those who created the entity. The City emphasizes to us the ad hoc and temporary character of the investigatory committee set up here by the Auburn city council as opposed to the permanence of other public entities created by statute or ordinance. Yet a distinction based upon the relative permanence of the entity in question is not found in the express language of the Act, and its legislative history precludes our reading that distinction into the Act's terms.

When enacted in 1959 the predecessor to the present Freedom of Access Act, popularly known as the "Right to Know Law," defined "public proceedings" as

> the transactions of any functions affecting any or all citizens of the State *by any administrative or legislative body of the State,* or any of its counties *or municipalities,* or of any other political subdivision of the State, which body is composed of 3 or more members, with which function it is *charged under any statute or under any rule or regulation* of such administrative or legislative body or agency.

P.L. 1959, ch. 219 (emphasis added). That provision, of much narrower scope than the current definition, limited the Act's applicability to the meetings of "administrative or legislative bod[ies]" that were acting under the authority of "any statute or ... rule or regulation." *Id.* Initially, therefore, the Act applied only to those permanent bodies that possessed actual decisionmaking authority and had been specifically charged by statute or rule to act. *Compare McLarty v. Board of Regents of Univ. System of Georgia*, 231 Ga. 22, 200 S.E.2d 117 (1973) (statute applied only to meetings "at which official actions are to be taken"); *Sanders v. Benton*, 579 P.2d 815 (Okla. 1978) (statute applied to governing bodies

and other boards supported by public funds). The Act as it stood in 1959 would not have covered the meetings of an ad hoc investigatory committee created solely by the city council decision to serve a limited purpose.

The 1975 amendments to the Act, however, removed the requirement that the bodies covered therein exercise some legislative or administrative authority by statute or rule—and thereby substantially broadened the Act's definition of "public proceedings." *See* P.L.1975, ch. 758. That removal of the restrictive language found in the 1959 Act prevents us from relying on the distinction urged by the City between the permanence of entities created by statute or ordinance and the temporary ad hoc character of this committee. In relevant part the Act now applies simply to "[a]ny board, commission, agency or authority of any ... municipality" that undertakes "functions affecting any or all citizens of the State." 1 M.R.S.A. § 402(2). There can be no doubt that the investigating committee created by the mayor and city council was charged with important "functions affecting any or all citizens of" Auburn. The City was faced with allegations of wrongdoing in its Civil Service Commission —an entity charged with hiring and promoting persons in civil service positions. Not only did the city council want those allegations investigated, but it also wanted recommendations on whether to abolish the Commission completely.

Furthermore, in view of the extensive links between the committee and Auburn's city council and mayor, we conclude that the Civil Service Study Committee is a "board, commission, agency or authority of ... [the] municipality" and hence covered by the Act's open meeting requirement. *Id.* § 402(2)(C). Notwithstanding the City's contentions to the contrary, we are not faced at this time with the Act's applicability to meetings held by committees completely disassociated from municipal governing entities. Rather, we are faced with a committee that at all times during its existence has maintained significant links to Auburn's city council and mayor. The mayor created the committee on the order of the city council and appointed all of its members. He attended the committee's first meeting and there charged the committee to investigate the problems that were plaguing the City's Civil Service Commission. He told the committee it could interview whomever it pleased, but recommended that it question certain named individuals. He asked the committee to make recommendations to him and the city council on how best to resolve the Civil Service Commission's problems and even on whether that commission should be continued or abolished. He also stated his belief that the committee could hold its meetings in private. The committee had available to it as well the legal advice of the city attorney on whether its meetings were covered by the Act. As the committee's investigation progressed, the city council voted to direct the mayor to invite certain individuals to be interviewed by the committee. Finally, after the Superior Court temporarily enjoined it from further closed meetings, the committee voted to suspend its meetings "pending the outcome of present litigation *or direction from [the mayor] and/or the City Council.*" (Emphasis added) The committee chair solicited the mayor's advice as to whether it should hold an additional open meeting after the issuance of the TRO.

Given that the committee has been charged with an important investigatory "function[ ] affecting any or all citizens" of the City of Auburn, it is clear that if the city council itself had investigated the Civil Service Commission the council's meetings would have come within the Act's open meetings requirement. The council cannot avoid that requirement through its decision to delegate that investigatory function to another entity, created by the council expressly for that purpose, especially when as here that specially created entity maintains substantial and continuing links with the parent council. In the factual circumstances of this case, the committee's meetings were "public proceedings" under the Freedom of Access Act.

The entry is:

Remanded to the Superior Court with instructions to enter judgment for plaintiff declaring that the meetings of the Auburn Civil Service Study Committee are public proceedings within the meaning of the Maine Freedom of Access Act.

ROBERTS, WATHEN and SCOLNIK, JJ., concur.

CLIFFORD, Justice, with whom GLASSMAN, J., joins, dissenting.

I respectfully dissent.

The boards, commissions, agencies or authorities made subject to the Freedom of Access Act by section 402(2)(C) are terms of art and not interchangeably used. They are created by statute, charter or ordinance, are permanent in nature, and nearly always have authority to do more than recommend. Examples would be municipal boards of appeal, 30 M.R.S.A. § 2411, planning boards, 30 M.R.S.A. § 4956, boards of assessment review, 30 M.R.S.A. §§ 2060(6), 5351(2), charter commissions, 30 M.R.S.A. § 1913, Auburn Civil Service Commission, City of Auburn Charter, art. VI, § 3, conservation commissions, 30 M.R.S.A. § 3851, energy commissions, 30 M.R.S.A. § 3861, urban renewal authorities, 30 M.R.S.A. § 4802, and municipal housing authorities, 30 M.R.S.A. § 4601. 5 M.R.S.A. § 8002 defines agency as any body authorized by law to adopt rules, to issue licenses or to take final action in adjudicatory proceedings.

In marked contrast is this ad hoc, temporary committee made up of citizens with no connection to city government. The mayor's committee is limited to an advisory role and is unfunded, its members serving without compensation. Any recommendations that it may make are advisory only, and cannot become effective without affirmative city council action, action fully subject to the Freedom of Access Law. Although the city council itself could have investigat-ed the civil service commission, by no means is it the only entity capable of performing that task. The city manager or a professional investigator could have performed the investigation. I see nothing here suggesting that the committee was formed or that the name "committee" was chosen to avoid the provisions of the Freedom of Access Act.[1]

Most courts addressing the issue facing us have held that such temporary, advisory committees are not subject to freedom of access laws unless specifically included within their provisions. *See, e.g., Washington School Dist. v. Martin,* 112 Ariz. 335, 541 P.2d 1137 (1975) (school district's textbook selection committee, established by school board to act in advisory capacity); *Wilson v. Freedom of Information Comm'n,* 181 Conn. 324, 435 A.2d 353 (1980) (state university's program review committee, appointed to review academic departments and make recommendations for improving efficiency); *Sanders v. Benton,* 579 P.2d 815 (Okl.1978) (citizen's advisory committee impaneled to provide information and make recommendations to board of corrections concerning proposed locations for community treatment center, but without decision-making authority); *Fraternal Order of Police v. City of Philadelphia,* 92 Pa.Cmwlth. 340, 500 A.2d 900 (1985) (advisory board established for temporary, limited purpose of investigating violent encounter between radical MOVE organization and city agencies).

In enacting the Freedom of Access Act, and including its own committees and subcommittees and committees and subcommittees of the Board of Trustees of the University of Maine and the Maine Maritime Academy, the legislature was obviously aware of the distinction between a board, commission, agency or authority and this type of ad hoc committee. Its omission of "committee" from section 402(2)(C) was deliberate and not inconsistent with

---

1. An entity is not necessarily immune from the Freedom of Access Law solely because it has been labeled a "committee." For example, 30 M.R.S.A. §§ 1451–1457 (Supp.1987), creating the Androscoggin County Budget Committee, provides by its own terms that meetings of that body be in public. However, unlike the ad hoc committee in the instant case, that statutorily created committee is permanent and has the power to decide the county budget submitted to the legislature.

the purposes of the statute. Because section 402(2)(C) plainly excluded on its face the kind of ad hoc advisory committee involved here, the court's resort to legislative history in order to fashion an inconsistent interpretation is inappropriate. *See Stone v. Board of Registration in Medicine,* 503 A.2d 222, 227–28 (Me.1986). I would not rewrite the statute as the court does, but rather, would remand to the Superior Court to dismiss plaintiff's complaint.