Fraternal Order of Police Lodge No. 5 and Robert S. Hurst, Appellants *v.* City of Philadelphia et al., Appellees.

Fraternal Order of Police et al., Appellants *v.* City of Philadelphia et al., Appellees.

Argued October 16, 1985, before President Judge CRUMLISH, JR., Judge COLINS, and Senior Judge BARBIERI, sitting as a panel of three.

*Robert B. Mozenter,* with him, *Anthony J. Molloy, Jr.,* and *Michael S. Durst, Mozenter, Molloy & Durst,* for appellants.

*Carl E. Singley,* Special Counsel, Philadelphia Special Investigation Commission, with him, *Ralph J. Teti,* Divisional Deputy City Solicitor, for appellees.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., October 21, 1985:

Before us are appeals of two separate Philadelphia Common Pleas Court orders which, in effect, held that the Mayor of Philadelphia did not exceed the authority of his office in creating the Philadelphia Special Investigation Commission and that the Commission did not violate the Pennsylvania Open Meeting

Law[1] when it adopted its Rules of Conduct for Commission Hearings.

The Fraternal Order of Police, Lodge No. 5 (FOP), initiated the two actions which sought (1) by way of a complaint in equity and accompanying motion for special or preliminary injunction to have the Commission declared an illegal entity under the Philadelphia Home Rule Charter and (2) by way of an amended complaint in mandamus and motion for preliminary injunction to have the Commission enjoined from proceeding until it validly promulgated its rules of conduct. The common pleas court denied the motions and summarily dismissed the complaints in each instance.[2] An application for supersedeas to this Court at No. 2649 C.D. 1985 was denied pending disposition of the merits of these appeals.

The Mayor, by Executive Order No. 5-85,[3] established the Commission to investigate the May 13, 1985 Osage Avenue incident which was the ''result of an

---

[1] Act of July 19, 1974, P.L. 486, *as amended*, 65 P.S. §§261-269.

[2] The record reveals that neither the Commission nor the City filed any responsive pleadings to the complaints or the motions for injunctive relief below. This Court is aware of this procedural defect; however, neither party raised it on appeal and, due to the importance of the issues before us, we will review the merits of the matter below.

[3] Executive Order No. 5-85 reads in pertinent part:

WHEREAS, on May 13, 1985, an incident occurred at 6221 Osage Avenue in the City and County of Philadelphia, Pennsylvania, that resulted in the loss of eleven lives and the destruction by fire of the homes and personal effects of sixty-one families in the surrounding neighborhood; and

WHEREAS, that incident was the result of an interaction between the so-called MOVE organization and various departments and agencies in the Executive and Administrative branch of Philadelphia City government; and

WHEREAS, under the Philadelphia Home Rule Charter said departments and agencies report to the Mayor as the Chief Executive Officer responsible for the Executive and Administrative branch of City government; and

interaction between the so-called MOVE organization and various departments and agencies in the Executive and Administrative branch of Philadelphia City

. . . .

WHEREAS, the incident of May 13, 1985, has given rise to complaints about the operation of the Executive and Administrative branch of City government and law enforcement within its boundaries; and

WHEREAS, it is important to the public confidence in City government that this incident be thoroughly investigated by an independent and impartial commission; and

WHEREAS, it is essential that this commission have the full authority granted to the Executive and Administrative branch by the Philadelphia Home Rule Charter in order to successfully perform this function; and

. . . .

NOW, THEREFORE, by the power vested in me in accordance with Section 8-409 of the Philadelphia Home Rule Charter as the Mayor of the City, it is hereby ordered:

(1) That the Philadelphia Special Investigation Commission is established to conduct a thorough, independent and impartial examination of the events leading up to and including the incident of May 13, 1985, in the neighborhood of 6221 Osage Avenue in Philadelphia, Pennsylvania.

(2) The Commission shall inquire into the conduct of City employees in the planning and implementation of City government actions prior to and on May 13, 1985.

(3) The Commission is authorized to conduct investigations, hold hearings and perform any other tasks related to the performance of its functions.

(4) The Commission is hereby granted the right of access to the records of any officer, department, board, agency or commission of the City relating to the MOVE organization and the events of May 13, 1985.

(5) The Commission shall have the authority vested in the Executive and Administrative branch of City government under the Philadelphia Home Rule Charter to compel the attendance and testimony of witnesses and the production of documents and other evidence relating to the

government.'' The Commission was authorized to conduct investigations and hold hearings and, vested with the authority of the executive and administrative branch, to issue subpoenas and compel the attendance and testimony of witnesses and the production of documents. The Commission was instructed to ''find facts and prepare a report for the Mayor and the *Citizens of Philadelphia* concerning the operation of City government as it relates . . . to the incident. . . .'' (Emphasis added.)

Our scope of review of the trial court's orders denying preliminary relief is limited to whether there were any apparently reasonable grounds to justify the Chancellor's actions, *Pennsylvania Interscholastic Athletic Association v. Geisinger,* 81 Pa. Commonwealth Ct. 421, 426, 474 A.2d 62, 65 (1984), and our review of its orders dismissing the complaints is whether it abused its discretion or committed an error of law. *Wightman Health Center v. Office of the*

incident of May 13, 1985; and, for that purpose, it may issue subpoenas requiring the attendance and testimony of persons and the production of documents and other evidence and cause them to be served in any part of the City.

(6) All employees within the Executive and Administrative branch of City government are hereby directed to fully cooperate with the Commission by promptly producing documents, records, files and any other information that the Commission may request. In addition, these employees, on request of the Commission, shall be available to meet with, be interviewed by, and testify before the Commission during its hearings.

. . . .

(9) The Commission is investigatory only, and shall find facts and prepare a report for the Mayor and the Citizens of Philadelphia concerning the operation of City government as it relates to the events giving rise to the incident of May 13, 1985 and may make suggestions for future handling of similar situations.

*Treasurer*, 59 Pa. Commonwealth Ct. 634, 430 A.2d 717 (1981).

The FOP contends that the trial court erred in holding that Sections 3-100(h) and 3-917 of the Charter[4] provided the Mayor with the authority to issue Executive Order No. 5-85 and create the Commission. It argues that the Mayor has usurped the authority of the legislative branch of City government, *i.e.,* Council, and invaded the power delegated to various departmental heads of City government and their officers, *i.e.,* the Fire Marshall and the Medical Examiner.

The Charter provides that the executive and administrative power of the City is exclusively vested in and exercised by the Mayor and the departments, commissions and boards established in it. 351 Pa. Code §1.1-102. The Mayor is the chief executive officer of the City and is responsible for the conduct of the executive and administrative work of the city and for law enforcement within its boundaries. 351 Pa. Code §4.4-100.

Section 3-100 of the Charter provides that the executive and administrative work of the City shall be performed by: the Mayor, the managing director, department heads, etc., and "[s]uch additional advisory boards as the Mayor may appoint." An advisory board's composition and duty is defined in Section 3-917 of the Charter, which states: "The Mayor may upon the request of the head of any department or of his own volition appoint a board of seven citizens to act in an advisory capacity to *such department* regarding the department's work or any specified phase of it." (Emphasis added.)

A reading of these provisions convinces us that the Mayor created a properly authorized advisory

---

[4] 351 Pa. Code §§3.3-100, 3.3-917.

Commission. Our review of the pertinent Charter provisions imposing the authority and responsibility of the legislative branch of City government on Council limits its scope of inquiry and investigation to prospective legislative ordinances.[5] Executive Order No. 5-85 in no way usurps the Council's responsibility.

The duty of the Fire Marshall,[6] the Coroner,[7] and other departmental heads to conduct their own respective investigations is not infringed upon by the Commission's authorization. The Mayor, as Chief Executive, may seek independent advice as to the departments' actions, for which he is responsible, in handling the City's confrontation with the MOVE organization.

The Commission, pursuant to Section 3-917, may hold hearings and issue subpoenas to investigate the executive and pertinent administrative *departments*.[8] In making findings concerning the various departments' conduct in handling the incident, the Commission is acting only in an advisory and consulting capacity, with no power whatsoever to bind the Chief Executive or the individual department heads.[9] In short, its duty is to examine the activity of the departments, determine credibility conflicts and suggest improvements in their administration.

---

[5] 351 Pa. Code §2.2-400.

[6] 53 Pa. C.S. §§14526, 14527.

[7] 16 Pa. C.S. §§9521-9524.

[8] While it is a wholesome and salutary objective to hold *open* hearings and to report its findings to the public, neither the Commission nor the Chief Executive Officer has specific authority to do so under Section 3-917 of the Charter. Considering the public need for full disclosure, this ordination in the Executive Order does not invalidate the Commission.

[9] We hold that the ultimate responsibility for the activity of the various departments reposes in the Chief Executive and it is therefore appropriate that the report should be made to him.

It must be remembered at all times that the Commission, in conducting itself, is merely a board of inquiry functioning without pre-judgment, bias, or presumption of incompetence or culpability. At no time, by attitude, tone or personal suspicion, may it convert the inquiry into an accusatory or adversarial proceeding. Such a posture would exceed the scope of its authority and would invalidate the Commission under Section 3-917 of the Charter.

Moreover, the Charter's authority specifically limits the scope of this inquiry.[10] It is not directed to the Chief Executive. It is specifically restricted to the departments engaged in the resolution of this controversial, unique occurrence. However, should the Commission find facts which give rise to potential violations of the Criminal Code, it would then be incumbent for the District Attorney or, in his reluctance, the Attorney General, to commence an investigation with the assistance of a Special Grand Jury to determine the extent of culpability, if any, of the Chief Executive, the department heads, and/or their agents or employees.

Acting consistently in this posture, the Commission is not on this record infringing on the duties of the fire marshall, the medical examiner, police, fire and other departmental heads. That various state and county officials, such as the Attorney General, the District Attorney of Philadelphia and the City Controller have the authority to lawfully investigate the activities of these departments in pursuing violations of the law does not negate the authority of this Commission as it carries out its limited mandated mission.

---

[10] The City contends that the Mayor has "inherent and implicit" power to create the Commission. We disagree. Executive Order No. 5-85 explicitly refers to the Charter for creating subpoena and other power in the Commission. We hold that the Mayor is bound by the Charter.

The FOP also contends that the Commission violated the Pennsylvania Open Meeting Law (Sunshine Law) by adopting its Rules of Procedure for Commission Hearings at a closed meeting.[11] It argues that the Commission, vested with the full authority of the executive and administrative branch of City government, is performing an essential government function and should be bound by the provisions of the Sunshine Law.

However, the Commission, as established, is a temporary, limited purpose, advisory board without authority to make a binding recommendation which would affect the substantive rights of any individual. Thus, this Commission lacks the essential character of the zoning boards, school boards, utility commissions, etc., all of which are controlled by the Sunshine Law.

We agree with the analysis of the Oklahoma Supreme Court which, although not faced with an identical open meeting law, addressed a statute similar in principle:

> Although different courts must construe different statutory provisions, it appears that the majority of other jurisdictions have generally held that *ad hoc committees or citizens advisory committees, empaneled for the purpose of furnishing information and recommendations* to governing or decision-making entities, are not subject to the open meeting laws unless they have actual, or defacto decision-making authority.

*Sanders v. Benton,* 579 P.2d 815, 819 (1978) (emphasis added).

Finding no error of law, we affirm the two orders of the common pleas court.

---

[11] The parties have stipulated that the Commission adopted its Rules of Conduct at a closed meeting.

## ORDER

The orders of the Philadelphia County Common Pleas Court, No. 2977 July Term 1985 dated July 16, 1985 and No. 4088 September Term 1985 dated September 27, 1985, are affirmed.